Garsh, E. Susan, J.
This matter is before the court on a request by William Francis Galvin, Secretary of the Commonwealth of Massachusetts (the “Secretary”), pursuant to G.L.c. 110A, §407(c), for an order requiring Massachusetts Mutual Life Insurance Co. (“Mass Mutual”) to comply with a subpoena duces tecum issued on June 15, 2005 (the “Subpoena”), as narrowed by a letter from the Secretary[1] dated July 28, 2005. More specifically, the Secretary requests that Mass Mutual be ordered to produce portions of a report prepared in connection with an investigation by a Special Committee of Mass Mutual’s Board of Directors (the “Report”) into alleged misconduct at Mass Mutual by its then president.[2] Mass Mutual opposes the request and seeks dismissal of the complaint on the grounds that the Secretary lacks jurisdiction to enforce the Subpoena because the Report does not relate to any alleged fraud in connection with the purchase or sale of a security or fraud in connection with the provision of investment advice and because the Secretary issued the Subpoena for the illegitimate purpose of harassing Mass Mutual.[3] For the reasons set forth below, the Secretary’s request is allowed, and the cross motion to dismiss the complaint is denied.
BACKGROUND
On June 2, 2005, the Board of Directors of Mass Mutual sent to Robert J. O’Connell, who was its president (the “President”), a notice of intention to terminate his employment for cause and to remove him from the Board of Directors (the “Notice”). The Notice followed receipt by the Board of Directors of the Report. Mass Mutual concedes that the June 2nd action of its Board of Directors was based in part on “the findings” contained in the Report. The Notice stated that the Board of Directors had determined that the President had engaged in a systematic and pervasive pattern of willful abuse of authority. Specifically, the Board found that the President had engaged in five independent types of misconduct that individually and in the aggregate resulted in material harm to Mass Mutual, the third of which was:
Interfering with the investigation and reprimand of your son-in-law and son relating to improper disclosure by your son Jared O’Connell, an employee of Oppenheimer Funds, to your son-in-law Rex Hampton, an employee of the Company, of confidential and proprietary information relating to Oppenheimer’s portfolio trading strategies. In particular, you failed to direct that there be an investigation of the facts and circumstances surrounding the improper disclosures of Oppenheimer’s confidential information and whether this information was used to engage in improper and/or illegal securities trading when such facts became known to you. Furthermore, you improperly caused the records relating to the underlying facts and circumstances and to the formal reprimand of your son and son-in-law to be removed from their personnel files and destroyed.
None of the other reasons in the Notice mentioned either Jared O’Connell (“O’Connell”), Rex Hampton (“Hampton”) or the Oppenheimer Funds and, with the possible exception of the basis for termination relating to shadow investments, none of the other reasons had any relationship to the purchase or sale of securities or to any possible misconduct by O’Connell or Oppenheimer Funds. For example, the second grounds for termination set forth in the Notice related to the President’s haring caused Mass Mutual to sell a condominium unit in Florida to himself for a price substantially below what Mass Mutual could have obtained in an arms-length transaction.
The Secretary’s Securities Division commenced an investigation on June 7, 2005. Oppenheimer refers to a group of affiliated entities, including Oppenheimer Funds Distributor, Inc., that, according to the Secretary, offer mutual fund securities for sale in Massachusetts and elsewhere and provide investment advice. Oppenheimer is owned by Mass Mutual. Oppenheimer Funds, Inc. is a registered investment adviser. Oppenheimer Funds Distributor, Inc. is a registered broker-dealer. O’Connell is listed on the Central Registration Depositoiy, a securities industry record-keeping database owned and maintained by the National Association of Securities Dealers, as having had general securities representative status with Oppenheimer Funds Distributor, Inc. from August 2002 until July of 2004.
In connection with an investigation, on June 10, 2005, the Secretary requested, in a letter of inquiry, that certain records voluntarily be produced by Oppenheimer Funds Distributor, Inc. relating to the investigation and/or disciplining of O’Connell.[4] On that same date, in another letter of inquiry, the Secretary requested that Mass Mutual voluntarily produce voluminous files, including the entire fifty-nine-page Report. The Secretary’s request was not limited to records relating to Oppenheimer Funds Distributor, Inc. or O’Connell.
Mass Mutual responded on June 15, 2005 that it had already voluntarily produced documents relating to the President’s termination to the Massachusetts Insurance Commissioner and to the Attorney General of Massachusetts and that while it did “not understand the basis for the Securities Division’s jurisdiction over this matter,” it would not object to the Secretary’s obtaining copies of material provided or to be provided to the Attorney General. Mass Mutual also pointed out that it could not comply with the production request within the short time frame set out in the Secretary’s letter and represented that, if the Secretary *535 identified particular documents relating to subjects within his jurisdiction that had not been provided to the Attorney General, Mass Mutual would promptly provide them on reasonable notice.
On June 15, 2005, the Secretary served the Subpoena upon Mass Mutual. The Subpoena required production, by the following day, of the entire Report and all documents relating to the President’s termination, as well as documents evidencing communications between O’Connell and Hampton and documents evidencing communications between the President and Oppenheimer concerning O’Connell and/or Hampton.
In an article that appeared in the Wall Street Journal on June 15, 2005, the Secretary is said to have stated that “he has requested documents related to the Mass Mutual board probe’s allegations that [the President] had suppressed efforts to discipline relatives, one of whom was employed at Oppenheimer Funds.”[5] In the same article, Attorney General Thomas Reilly is quoted as having said that his office is “reviewing serious allegations of wrongdoing uncovered by the company,” following a preliminary review of documents submitted by Mass Mutual. In an article that appeared about the Subpoena in the Boston Globe on June 16, 2005, Galvin is said to have accused Mass Mutual of “stonewalling his office’s investigation of the circumstances behind the abrupt firing of [its President] on June 2.” With reference to Mass Mutual’s having provided records to state insurance regulators and to the Massachusetts Attorney General, the Secretary is quoted in that article as having said that “[this] is not a situation where they get to choose [with whom they cooperate on investigations because Mass Mutual has brokerage operations] licensed by my office, and therefore are obligated to respond to our legitimate inquiries.” In an Associated Press story that appeared in The Republican on June 18, 2005, a spokesman for the Secretary is said to have indicated that the Secretary was “looking into his legal options which could include asking a judge to intervene.”
Mass Mutual contested the Secretary’s statutory authority to pursue his investigation. It filed a complaint in Superior Court for Hampden County on June 17, 2005, seeking to quash the Subpoena.
In an article about the suit that appeared in the Boston Herald on June 21, 2005, the Secretary is said to have stated that he was only seeking information relating to Mass Mutual’s Oppenheimer mutual fund unit, which unit, according to the Secretary, has faced several reported high-level executive departures as well as allegations that the President’s son was involved in a trade-tip controversy while at the firm. The article quotes the Secretary as having said about Mass Mutual’s suit, “[t]his demonstrates a degree of arrogance on their part. They just don’t want to answer questions.” On the same day, an Associated Press story that appeared on TheBostonChannel.com quoted the Secretary as having said the following about the action filed by Mass Mutual: “It’s evidence of their arrogance that they would bring this action. I’m eager to determine what has occurred, and they don’t want regulators to look at the information.” The Secretary is also quoted in that article as having stated that Mass Mutual is in “significant turbulence,” and that he was “simply trying to verify that the investors’ interests are being protected.”
By Order dated July 12, 2005, the Superior Court (Sweeney, J.) dismissed the action filed by Mass Mutual without prejudice, stating that it could be renewed in the event that the Secretary should move to enforce the Subpoena. Massachusetts Mutual Life Insurance Company v. Galvin, Civil No. 05-613 (Hampden Super.Ct. July 12, 2005), slip op. at 8. In the course of the opinion, the court recognized that the Secretary has the right to proceed independently of the Attorney General and the Commissioner of Insurance to the extent provided by law. Id. at 2 n. 1. The court also noted that Mass Mutual is a mutual life insurance company, owned by its policy-holder members, and that public oversight of the company is the responsibility of the Commissioner of Insurance and the Attorney General because Mass Mutual does not issue securities. Id. at 2-3. Given the breadth of the Subpoena, the court indicated that it appeared to extend well beyond the power granted to the Secretary by the Massachusetts Uniform Securities Act, G.L.c. 110A, §101 et seq., while at the same time indicating that it appeared that the Subpoena sought “relevant information regarding the Oppenheimer aspect of [the President’s] firing.” Id. at 5. In the context of discussing whether Mass Mutual had standing to seek to quash the subpoena before the Secretary moved to enforce it, the court referred to the “potentially destabilizing effect the Secretary’s reported and seemingly unsupported [public] comments that the plaintiff Mass Mutual is in ‘significant turbulence’ and he must ‘protect’ its ‘investors’ (even though he has no statutory authority to provide such protection) may have on the plaintiff.” Id. at 5.
After the court issued its decision opining that the Secretary seemed to misunderstand the reach of his powers under chapter 110A, the Secretary issued a letter to Mass Mutual on July 28, 2005, that narrowed significantly the scope of the Subpoena. The narrowed request required, inter alia, production by Mass Mutual, on or before August 4, 2005, of those sections of the Report that were the basis for Mass Mutual’s decision to terminate the President relating to O’Connell and the Oppenheimer funds.
Mass Mutual has refused to produce any portion of the Report to the Secretary in the absence of the Secretary agreeing to execution of an “appropriate confidentiality agreement.” The Secretary has advised Mass Mutual that the Public Records Act, G.L. 66, § 10,[6] precludes him from entering into such an agree *536 ment, but that, while his investigation is ongoing, he would assert the exemption in that statute for investigatory materials, G.L.c. 4, §7, Twenty-sixth (f).[7] The Secretary also agreed that, upon completion of the investigation, should the Report be the subject of a public record request, he would provide Mass Mutual with ten days’ notification prior to releasing it. The Secretary has taken the reasonable position that he can offer Mass Mutual “no more assurances than the public records law allows” and that its “insistence on requiring an iron-clad confidentiality agreement is unreasonable under the circumstances.” The Secretary has also advised Mass Mutual of his willingness to review any legal authority applicable in Massachusetts pertaining to the confidentiality of the Report.
The instant action was filed on October 27, 2005. In a Boston Globe article about the suit, dated November 23, 2005, the Secretary is quoted as having stated in an interview that Mass Mutual “continuéis] to stonewall us at every turn when we try to get information,” and that “Mass Mutual has decided that they didn’t have to produce the documents, but there is no question that we have jurisdiction over mutual funds.”
By letter dated December 5, 2005, Mass Mutual reiterated that it was willing to produce the relevant pages of the Report if the Secretary “agrees to maintain their confidentiality.” At a deposition of Mass Mutual’s Head of Compliance taken by the Secretary, Mass Mutual also agreed to permit the Secretary to review a copy of the relevant pages of the Report and to question the witness regarding the Report provided that the pages were returned to Mass Mutual and did not, thereby, became part of the Secretary’s files or otherwise become part of the record. The Secretary rejected that proposal. Alternatively, Mass Mutual requested the Secretary to permit his outside counsel to review the Report so that they could determine if there is any basis to continue to seek to enforce the Subpoena. That offer also was rejected.
Mass Mutual has provided the Report to the Attorney General for the Commonwealth of Massachusetts, the Massachusetts Commissioner of Insurance, and the Attorney General for the State of Connecticut.
Mass Mutual represented to the Secretary that the Office of the Massachusetts Attorney General entered into a confidentiality agreement with Mass Mutual regarding the Report, but did not, in response to the Secretary’s written request, produce any writings that memorialized such an agreement. The agreement with the Massachusetts Attorney General was not, in fact, reduced to writing. The Secretary requested Mass Mutual to provide, if no such written documentation exists, the name of the person who granted the confidentiality status so that the Secretary could contact such person to discuss the confidentiality agreement entered into and its efficacy under the Massachusetts Public Records Law. There is no indication that this information was provided by Mass Mutual. At the hearing on the Secretary’s request to enforce the Subpoena and the cross motion to dismiss, counsel for Mass Mutual represented that the Report was provided to the Massachusetts Attorney General on an “understanding” that it would be covered by a “common work product privilege.” Counsel further represented that the Attorney General acknowledged that the Report would constitute common work product and agreed that it would not be subject to disclosure.
There also is no written agreement with the Attorney General of Connecticut. Mass Mutual advised the court that when it produced the Report to the Connecticut Attorney General, it was the company’s understanding that the production was pursuant to an ongoing anti-trust investigation and would not become part of the public record. In response to a suit by Mass Mutual seeking to prevent the Connecticut Attorney General from disclosing the Report to the Hartford Courant, a Connecticut Superior Court judge rejected Mass Mutual’s contention that the Report had been provided in response to and under the authority of an anti-trust subpoena that had been served upon it on November 2, 2004. MassMutual Life v. State of Connecticut, Civil No. 05 4014549 (J.D of Hartford August 25, 2005), slip op. at 4-5 (39 Conn. L. Rptr. 868) (Connecticut General Statutes §35-42(c), which provides that documents furnished to Attorney General are not available to the public and must be returned to the provider at the termination of the Attorney General’s investigation, does not apply to the Report because it was not provided to the Attorney General because of the anti-trust subpoena). The court also rejected all the other arguments raised by Mass Mutual, holding that release of the Report would not constitute a tortious invasion of privacy, id. at 5-6, that its status as an attorney-client privileged document would not prevent its disclosure, id. at 6-7, that, in any event, Mass Mutual likely waived that privilege by voluntarily submitting the Report to the Attorney General, id. at 7, that the evidence was insufficient to support a finding of an explicit agreement between Mass Mutual and the Connecticut Attorney General because “at best, MassMutual made a request for confidentiality to which the Attorney General declined to give explicit assurance,” id. at 8, that the common interest doctrine would not preserve Mass Mutual’s attorney-client privilege, id. at 9, that the common-law privileges for law enforcement and work product are not incorporated into the exemptions from compelled disclosure under the Connecticut Freedom of Information Act, id., and that Mass Mutual was not entitled to a writ of mandamus to compel the Attorney General to use his discretion to determine whether the Report is exempt because the exemptions in the Connecticut Freedom oflnformation Act are permissive. Id. at 9-10. The court declined to grant the injunctive relief requested by Mass Mutual. Disclosure of the Report by the Connecticut Attorney General has been stayed *537 pending Mass Mutual’s appeal of the Superior Court’s decision.
DISCUSSION
This court should enforce the Subpoena as narrowed by the Secretary provided that it has a legitimate purpose within the Secretary’s statutory authority; the information sought by the Subpoena may be relevant to the Secretary’s inquiry; the information sought is not already within the Secretary’s possession; and the Subpoena has not been issued for an improper purpose, such as harassment of Mass Mutual. See United States v. Powell 379 U.S. 48, 57-58 (1964) (Commissioner of Internal Revenue need not meet standard of probable cause to obtain enforcement of his summons) .
General Laws c. 110A, §101 makes it unlawful for any person to engage in any act or fraud or deceit in connection with the offer, sale or purchase of any security.[8] Section 102 makes it unlawful for any person who receives any consideration from another person to engage in fraud or deceit in connection with the provision of investment advice.[9] Mass Mutual’s contention that the Report has nothing to do with the purchase or sale of any security by the President, O’Connell or Hampton ignores the fact that the Report deals, in part, with the President’s having arranged for the destruction of records relating to an investigation into whether Oppenheimer’s confidential information “was used to engage in improper and/or illegal securities trading.”
Furthermore, Mass Mutual’s arguments concerning the scope of the Secretary’s jurisdiction is mistakenly premised on sections 101 and 102 of chapter 11OA being the only provisions conceivably relevant to the Secretary’s jurisdiction to issue the Subpoena. Section 201 of chapter 110A, however, requires any person who transacts business in the Commonwealth as a broker-dealer, agent of a broker-dealer, investment adviser, or investment adviser representative to be registered under chapter 110A. Oppenheimer Funds, Inc. is a registered investment adviser and Oppenheimer Funds Distributor, Inc. is a registered broker-dealer. O’Connell was registered as having general securities representative status with Oppenheimer Funds Distributor, Inc. Section 204 of the Act gives the Secretary broad oversight authority over registered persons. The Secretary may, for example, discipline a registrant who “has willfully violated or willfully failed to comply with any provision of’ chapter 110A or any rule or order promulgated thereunder, G.L.c. 110A, §204(a)(2)(B), or who “has engaged in any unethical or dishonest conduct or practices in the securities, commodities or insurance business.” G.L.c. 110A, §204(a)(2)(G).[10] A document that makes findings with respect to a non-registered individual’s interference into an investigation as to whether a registered entity misused proprietary information relating to that registered entity’s portfolio trading strategies may, at a minimum, be relevant to whether that registered entity has engaged in unethical or dishonest conduct or practices in the securities business.
Chapter 110A, §407(a)(l) broadly provides that the “secretary in his discretion may make such public or private investigations ... as he deems necessary to determine whether any person has violated or is about to violate any provision of this chapter or any rule or order hereunder, or to aid in the enforcement of this chapter or in the prescribing of rules and forms hereunder.” In connection with the exercise of his investigatory powers, the Secretary is authorized to subpoena witnesses and compel their attendance and to require the production of any papers, documents or records “which the secretary deems relevant or material to the inquiry.” G.L.c. 110A, §407(b). In the event of a refusal to obey a subpoena, the Superior Court, upon application by the Secretary, may order a person to appear before the Secretary and to produce documentary evidence touching upon the matter under investigation. G.L.c. 110A, §407(c).
The Public Records Act requires the disclosure, upon request, of any “public record” without unreasonable delay. G.L.c. 66, § 10(a). The term “public records” includes all documents “made or received” by any officer or employee of any agency, executive office, department, division or authority of the Commonwealth unless it falls within one of several enumerated exemptions. G.L.c. 4, §7, Twenty-sixth (a)-(p). There is a presumption that any record sought is public with the burden upon the custodian to prove with specificity the exemption which applies. G.L.c. 66, § 10(c).
That the Report may be open to public inspection at some point after it has been received by the Secretary is not a reason to refuse enforcement of the Subpoena. See Boston Police Superior Officers Federation v. City of Boston, 414 Mass. 458, 465-66 (1993) (the public records law and its exceptions do not restrict a commission’s power to subpoena documents). Whether or not the Report is exempt from public disclosure has no bearing upon whether the Secretary has jurisdiction to require it to be produced. See Town Crier, Inc. v. Chief of Police of Weston, 361 Mass. 682, 691 (1972) (“All police records ... whether or not they are public records, are subject to being summoned before a proper tribunal in accordance with established rules of law”).
The court’s role in a proceeding to enforce an administrative subpoena issued by the Secretary is a limited one. Like the federal Securities Act, chapter 110A gives the Secretary authority to require the production of records in the course of conducting an investigation, “and in [the] absence of a basis for saying that its demand exceeds lawful limits . . . [the Secretary] is entitled to the aid of the court in obtaining them.” Penfield Co. v. Securities & Exchange Commission, 330 U.S. 585, 591 (1947). Decisions construing federal securities law are applicable to the Massachu *538 setts Uniform Securities Act, G.L.c. 110A, §101 etseq. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50-51 (2004). See also G.L.c. 110A, §415.
The Secretary's demand, as narrowed, does not exceed the lawful limits of his authority. To the extent that, as set forth in the Notice, the Report deals with the President’s interference with an investigation into “improper disclosure by ... an employee of Oppenheimer Funds ... of confidential and proprietary information relating to Oppenheimer’s portfolio trading strategies” and to the extent that it relates to “improper disclosure of Oppenheimer’s confidential information” and to the President’s having caused records “relating to the underlying facts and circumstances” to be destroyed, which underlying facts and circumstances include whether such proprietary information “was used to engage in improper and/or illegal securities trading,” the Report unquestionably relates to matters within the broad oversight authority of the Secretary. The Secretary’s interpretation of his statutory mandate in connection with issuance of the Subpoena as narrowed is not “patently wrong, unreasonable, arbitrary, whimsical, or capricious” and thus is entitled to some deference. Box Pond Association v. Energy Facilities Siting Board, 435 Mass. 408, 416 (2001). “This is particularly so with respect to internal agency matters such as the issuance of subpoenas directed at the gathering of evidence for an agency proceeding . . .” Boston Police Superior Officers Federation, 414 Mass. at 462.
The fact that the Subpoena was overly broad before it was narrowed does not mean that the Secretary is seeking limited portions of the Report in order to investigate a breach of fiduciary duty, nepotism, or favoritism at, or mismanagement of, a Massachusetts based mutual insurer. It does not follow from the fact that information concerning a registered entity subject to chapter 110A, §201 may appear in the context of a report detailing mismanagement of a non-registered entity that the demand for the report’s production necessarily implies that the Secretary is investigating acts of mismanagement that may be detailed in that report. Nothing precludes the Secretary from subpoenaing information he deems relevant or material to his investigation of the actions of the Oppenheimer Funds merely because such information may be found in an assessment of whether the President breached his fiduciary duty. Thus cases such as Menides v. The Colonial Group, Inc., 681 F.Sup. 965, 972 (D.Mass. 1987) (securities fraud claims are not “intended to bring within their ambit simple corporate mismanagement or every imaginable breach of fiduciary duty . . .”), are irrelevant. The Secretary does not seek the Report in order to investigate Mass Mutual; he does so to aid in his investigation of the Oppenheimer Funds. For purposes of that investigation Mass Mutual may be required to produce any record that the Secretary “deems relevant or material to the inquiry.” G.L. 110A, §407(b).
Mass Mutual alternatively contends that the Subpoena should not be enforced because it is designed to harrass Mass Mutual. It maintains that the Report is being demanded by the Secretary solely to enable him to achieve a public relations coup by releasing it to the media. See Powell, 379 U.S. at 58 (court should not enforce a summons that has been issued for an improper purpose, such as to harass or put pressure on subpoenaed party to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation); United States v. Gertner, 65 F.3d 963, 971 (1st Cir. 1995) (upholding finding that administrative agency’s sole purpose for summons was to gain information about lawyer’s unnamed client and that stated purpose for issuing the summons was merely a pretext for its real purpose). The record, however, warrants no reasonable inference that, in seeking limited portions of the Report relating to possible improper disclosures of confidential and proprietary information concerning Oppenheimer’s portfolio trading strategies, the Secretary is motivated by an improper purpose, namely to ensure that portions of the Report will enter into the public domain.
Mass Mutual sees something nefarious in the Secretary refusing to agree to hold the Report confidential should it be produced. This court does not. The Secretary’s refusal warrants no reasonable inference that his demand for limited portions of the Report is motivated by an improper purpose because a public employee has no authority to override, by means of a promise of confidentiality, the General Court’s determination that any document “made or received” by a public employee shall be available to the public unless one of the legislatively enacted exemptions applies.
Mass Mutual’s purported ability to arrive at “mutually acceptable ground rules” with other agencies, if true, may suggest that not every state employee is as careful as the Secretary to safeguard the public’s right of access to public records; it most certainly does not suggest that the Secretary is motivated by an improper purpose. Mass Mutual, for example, contrasts the Secretary’s behavior with that of the Attorney General, and argues that the Attorney General’s willingness to be accommodating demonstrates the Secretary’s bad faith. Mass Mutual represents that the Report provided to the Massachusetts Attorney General will not become public at the conclusion of his ongoing criminal investigation because it was “provided to the Attorney General on an understanding that there was a common work product privilege, and that therefore it would be privileged, and the Attorney General did acknowledge that and did agree that it would not be subject to disclosure.” There is, however, no exemption in the Public Records Act for work product. A Massachusetts state employee may not, by characterization of records as “work product,” withhold documents whose production is otherwise mandated under the terms of the Act. General Electric Co. v. Department of *539 Environmental Protection, 429 Mass. 798, 801-07 (1999). Indeed, the Supreme Judicial Court has acknowledged the Attorney General’s failure to obtain legislative approval of measures providing an exemption for “documents, information, and tangible things prepared in anticipation of litigation.” Id. at 803 n.6. There may, indeed, be compelling policy reasons to maintain from public view a company’s internal investigation in order to safeguard the confidentiality of employees who were interviewed, prevent the chilling of future investigations, and foster appropriate corporate self-governance, but it is the Legislature, and not the Secretary (or the Attorney General), which determines whether to create an exemption. The Secretary’s refusal to commit himself never to produce any portions of the Report if requested to do so by a member of the public does not support the proposition that his demand for limited portions of the Report to be produced by Mass Mutual is pretextual.
Furthermore, the Secretary has not stated that he will release the Report immediately upon the conclusion of his investigation. In addition to offering to provide Mass Mutual with notice should there be a request for the Report after the conclusion of his investigation, the Secretary has assured Mass Mutual that he “would be happy to review any legal authority applicable in Massachusetts which [Mass Mutual] believe[s] would be inconsistent with the decision in Connecticut.” Mass Mutual’s response provides no authority whatsoever in support of the applicability of any of the legislatively enacted exemptions. Moreover, neither in its Memorandum in Support of its Opposition to the Request to Enforce or in Support of its Motion to Dismiss nor at the hearing did Mass Mutual identify any exemption in the Public Records Act which it believed would render the Report exempt from release if provided to the Secretary. Instead, counsel for Mass Mutual stated that Mass Mutual was quite concerned that it would not be successful in arguing that any exemption applied. Mass Mutual’s primary concern is that the Report, if produced to the Secretary, may not be exempt and, therefore, its production inevitably would lead to its becoming public.
Mass Mutual rather optimistically assumes that the same fate will not befall the copies of the Report that already have been provided to the Commissioner of Insurance[11] and to the Attorneys General of Massachusetts and Connecticut. Given the reasoning and findings contained in the Connecticut Superior Court’s decision and Mass Mutual’s failure to point to any valid confidentiality agreement with the Attorney General of Massachusetts, it hardly would be unreasonable for the Secretary to assume that the Report eventually will become public whether or not he obtains it.
In addition to the Secretary’s refusal to agree to maintain the confidentiality of any portion of the Report provided by Mass Mutual, his refusal to review the Report without retaining a copy or to permit his outside counsel to do so is offered as further evidence that the Secretary’s sole motivation is to make the Report public. However, having determined that portions of the Report are or may be relevant to his lawful investigation, the Secretary understandably refuses to allow a witness to control the manner and means in which his investigation is to be carried out. That the Secretary may not share Mass Mutual’s concern about portions of the Report becoming public does not mean that he is seeking to enforce the Subpoena for the express purpose of making the Report public. There is no credible evidence in the record that the Secretary is so motivated. Further, it would not be unreasonable for the Secretary to regard the suggestion that the Report be viewed but not retained and accordingly not be deemed “received” as contrary to public policy. “[A] record in public hands is presumed to be public within the Public Records Act.” Coleman v. Boston Redevelopment Authority, 61 Mass.App.Ct. 239, 243 (2004). At a minimum, Mass Mutual’s “look but do not file” stratagem is one that likely would create a public perception that the Secretary and Mass Mutual had entered into a collusive end-run around the Legislature’s determination that there must be disclosure of all materials “received” by a public employee unless one of the enumerated statutory exemptions is applicable.
Although the Subpoena, when initially served, unquestionably was overly broad, the letter to Mass Mutual narrowing it appears to have been a genuine attempt to confine the Subpoena to “information regarding the Oppenheimer aspect of [the President’s] firing,” which a judge of this court had characterized as relevant. Nothing in the ruling in the action in Hampden County Superior Court brought by Mass Mutual suggests that the Secretary acted in bad faith when, after the decision in that case was rendered, he demanded those sections of the Report that were the basis for Mass Mutual’s decision to terminate the President relating to O’Connell and Oppenheimer Funds.
The investigation being conducted by the Secretary is a matter of legitimate public interest. Neither the Secretary’s willingness to be interviewed by the media concerning that investigation nor the statements he is reported to have made demonstrate that his narrowed demand for select portions of the Report is pretextual. Mass Mutual may not believe that its opposition to production of any portion of the Report can be fairly characterized as “stonewalling,” but that the Secretary would hold that opinion is not surprising. The Secretary’s willingness to vent his frustration in the media does not support the presence of Gertner-type pretext here.
The court has denied Mass Mutual’s request, which was opposed by the Secretary, that the court examine portions of the Report in camera. The Secretary need *540 not establish at this stage that chapter 110A definitely has been violated or that the Report definitely will provide evidence of such a violation. Where, as here, the narrow request for those portions of the Report that deal with the termination of the President for reasons related to improper disclosure of confidential Oppenheimer Fund information seeks records so clearly within the Secretaiy’s jurisdiction to investigate potential violations, an in camera review to determine if such portions of the Report, in fact, would establish or tend to prove some particular violation would impermissibly invade the authority granted to the Secretary by the Legislature under G.L.c. 110A, §407(b) to examine those documents “which the secretary deems relevant or material to the inquiry.” Although the Secretary may not act arbitrarily or in excess of his statutory authority in exercising his investigative function, “this does not mean that his inquiry must be ‘limited ... by forecasts of the probable result of the investigation’ . . .” Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 216 (1946). The Secretary “must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the Commission’s regulatory authority.” Securities & Exchange Commission v. Brigadoon Scotch Distributing Co., 480 F.2d 1047, 1053 (2d Cir. 1973).
In sum, the Secretary is entitled to an order compelling the production of those portions of the Report that pertain to the third reason given by the Board of Directors of Mass Mutual for terminating the President’s employment.
ORDER
For the foregoing reasons, it is hereby ORDERED that the Secretary of the Commonwealth’s request for an order compelling compliance with the subpoena duces tecum served upon Massachusetts Mutual Life Insurance Company as modified by letter dated July 28, 2005 be and hereby is ALLOWED. Massachusetts Mutual Life Insurance Company is hereby ORDERED to appear before the Secretary, or the officer designated by him, on or before February 4, 2006, and to produce those “sections of the fifty-nine page report that was the basis of’ Massachusetts Mutual Life Insurance Company’s decision to terminate Robert J. O’Connell relating to Jared O’Connell and the Oppenheimer Funds. It is further ORDERED that the cross motion of Massachusetts Mutual Life Insurance Company to dismiss the complaint be and hereby is DENIED.

 The court uses the term “Secretary” to refer to William F. Galvin himself as well as to persons in the Massachusetts Securities Division, such as the Securities Division’s Enforcement Attorney, who are acting under his authority.

 Mass Mutual has represented that it has produced all documents requested in the July 28, 2005 letter except for the investigatory report and documents evidencing the performance of its former president’s SRA account from August 5, 2002 through July 16, 2004. The Secretary is not, at this time, seeking to compel production of the SRA records and, at the hearing on the request to enforce, the parties confirmed that no issue concerning the SRA records was before the court.

 Mass Mutual does not oppose the request for enforcement on the grounds that the Report is privileged.

 There is no suggestion that Oppenheimer Funds Distributor, Inc. has not fully complied with the Secretary’s request.

 Mass Mutual has submitted copies of various newspaper articles in support of its argument that the Secretary issued the Subpoena for an improper purpose.

 G.L. 66, § 10(a) provides, in relevant part, that “[ejveiy person having custody of any public record, as defined in clause Twenty-sixth of section seven of chapter four, shall, at reasonable times and without unreasonable delay, permit it, or any segregable portion of a record which is an independent public record, to be inspected and examined by any person, under his supervision, and shall furnish one copy thereof upon payment of a reasonable fee.”

 “Investigatoiy materials” are those that are “necessarily compiled out of the public view by law enforcement or other investigatory officials, the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest.” G.L.c. 4, §7, Twenty-sixth (f).

 G.L.c. 110A, §101 provides that “(i]t is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.”

 G.L.c. 110A, §102 makes it “unlawful for any person who receives, directly or indirectly, any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise (1) to employ any device, scheme, or artifice to defraud the other person, or (2) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.”

 G.L.c. 110A, §204(a) provides that the “secretary may by order impose an administrative fine or censure or deny, suspend, or revoke any registration or take any other appropriate action if he finds (1) that the order is in the public interest and (2) that the applicant or registrant, or, in the case of a broker-dealer or investment adviser, any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser” has engaged in any one of several enumerated acts.

 No confidentiality agreement was entered into with the Commissioner of Insurance because Mass Mutual believes that the Report produced to the Commissioner of Insurance will be protected from public disclosure by a statute granting confidentiality to records produced to the Commissioner of Insurance as part of the annual financial inspection of insurance companies and thus need not be made public under the Public Records Act. Gen. Laws c. 4, §7, Twenty-sixth (a) exempts from mandatory disclosure a record “specifically or by necessary implication exempted from disclosure by statute.”